IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRIGL GRAVES, VIRGIL GRAVES, SR., BEVERLY WARD, and COREY GRAVES,<br><br>     Plaintiffs,<br><br>     v.<br><br>CITY OF STOCKTON, STOCKTON POLICE DEPARTMENT, CHIEF MARK W. HERDER, OFFICER JENNEIAHN (#1471), OFFICER FRY (#1480), OFFICER JOHNSON (#4k49), OFFICER GRAVIETTE, SENIOR CADET WONG, SGT. MURRELL, SGT. RESTUCIA, OFFICER RIDENOUR (#1433), DETECTIVE C. VILLANUEVA (#1120), DETECTIVE T. KAMIGAKI (#4188), OFFICER THRUSH (#1114), and DOES 4 to 20,<br><br>     Defendants. | CIV-S-04-0430 DFL KJM<br><br><br>MEMORANDUM OF OPINION<br>AND ORDER |

   Plaintiffs Virgil Graves, Jr. ("Graves"), Virgil Graves, Sr. ("Graves, Sr."), and Corey Graves ("Corey") bring this excessive force action against the City of Stockton ("City"), the Stockton Police Department ("SPD"), and twelve individual officers under

1

42 U.S.C. § 1983 and several state statutes. Defendants move for summary judgment on all of plaintiffs' claims. For the reasons stated below, the motion is DENIED in part and GRANTED in part.

I.

This case turns on whether the defendant officers used excessive force on two different occasions. The parties agree that a police dog bit Graves on the two occasions. However, the parties present conflicting accounts of the facts and circumstances surrounding the incidents. Because defendants filed this motion for summary judgment, the court views the facts and circumstances surrounding each incident in the light most favorable to plaintiffs. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505 (1986).

A.  March 22, 2002

The first incident occurred on March 22, 2002. The court accepts the following facts as true for purposes of this motion. Officers Jenneiahn and Fry responded to a disturbance involving Graves and another man. (Pls.' Resp. to SUF ¶ 2.) When the officers arrived on the scene, Graves and the other man were yelling at each other. (Id. ¶ 4.) The officers separated the two men. (Id.) Jenneiahn walked with Graves towards a police car. (Graves Dep. 37:4, Oct. 25, 2005; Jenneiahn Dep. 20:11, May 18, 2005.) Jenneiahn informed Graves numerous times that he was not under arrest. (Pls.' Resp. to SUF ¶ 7.) Graves voluntarily submitted to a pat-down by Jenneiahn. (Id. ¶ 8.) The pat-down did not uncover a weapon. (Id.) Officer Jenneiahn instructed

2

Graves to get into the police car. (Id. ¶ 9.) Graves complied with Jenneiahn's request and sat in the backseat of the police car. (Graves Dep. 38:20-39:2.) Johnson arrived on the scene with a police dog. (Pls.' Resp. to Defs.' SUF ¶ 11.) While Graves was seated in the car, Johnson's police dog attacked him without warning. (Graves Dep. 40:15-16; 42:1-12.) Moments later, Jenneiahn began striking Graves with a baton and taunting him. (Id. 40:17-19; 42:24-43:3.) Graves remained in the vehicle for approximately one minute before an officer pulled him out of the car by his hair. (Id. 41:9-13.) Using its teeth, the dog held Graves' arm throughout the entire incident, and did not release its grip until after the police had Graves in handcuffs. (Id. 40:21-41:6.) Graves' bite wounds were treated at the County Hospital. (Pls.' Resp. to Defs.' SUF ¶ 31.)

B.   April 10, 2002

The second incident occurred on April 10, 2002. The court accepts the following facts as true for purposes of this motion. Graves escaped from police custody on April 7, 2002. (Pls.' Resp. to Defs.' SUF ¶ 35.) On April 10, 2002, the police staked out Graves' apartment because he was wanted for robbery and escape. (Id. ¶ 36, 38.) At some point, Graves got into a car with his mother, Corey, and Graves, Sr. and drove away from the apartment building. (Id. ¶¶ 40-41.) Graves and his family pulled into a gas station and Graves exited the vehicle. (Id. ¶ 42-43.) Two plainclothes police officers arrived at the gas station in an unmarked car, got out of the car, drew their

3

weapons, and ordered Graves to "freeze." (Graves Dep. 59:6-15.) Several other officers arrived on the scene and also drew their weapons. (Id. 59:15-18.) The officers instructed Graves to get on the ground. (Id. 59:18-19.) Graves raised his hands in the air and lowered himself to his knees. (Id. 61:13-15.) An officer approached Graves and kneed him. (Id. 61:16-18.) Graves grabbed a nearby steel pole that was concreted into the ground. (Id. 62:1-2.) After five other officers approached Graves and began striking him, Graves let go of the pole. (Id. 62:10-14, 63:22-24.) The officers took control of Graves' arms, began choking him, and sprayed mace on his face. (Id. 63:25-64:10.) The officers handcuffed Graves, put leg restraints on him, and connected the leg restraints to the handcuffs in a "hogtie". (Id. 65:7-17.) At that point, while he was hogtied and on the ground, the police dog attacked Graves without warning. (Id. 65:7-9; 65:15-18; 64:24-65:3.) The dog bit him several times on the shoulder and ripped off a chunk of his left ear. (Id.) The officers then threw Graves into the back of a police car and took him to jail. (Id. 65:4-6.) After photographing him at the jail, the police took Graves to the County Hospital for treatment. (Id.) Graves, Sr. and Corey witnessed the events at the gas station.

## II.

Plaintiffs originally asserted a host of claims against fourteen defendants. After defendants moved for summary judgment, the parties stipulated to dismiss all claims except the

4

following: (1) Graves' § 1983 claim for excessive force in violation of the Fourth Amendment against the City, Jenneiahn, Johnson, Villanueva, Kamigaki, and Thrush; (2) Graves' claims for battery and negligence against the City, Jenneiahn, Johnson, Villanueva, Kamigaki, and Thrush; and (3) Graves, Sr. and Corey's intentional infliction of emotional distress and negligence claims against the City, Villanueva, Kamigaki, and Thrush. Defendants move for summary judgment on all claims.

A.   Excessive Force

The officers argue that they are entitled to qualified immunity from Graves' excessive force claim under § 1983. Qualified immunity protects "government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).  Courts follow a two-step test when determining whether an official is entitled to qualified immunity.  First, the court must determine whether "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show [that] the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001). Second, the law must clearly establish "that the officer's conduct was unlawful in the circumstances of the case." Id. at 207.  According to plaintiff Graves' version of the facts, on both occasions the defendant officers used a dog to bite Graves

when there was no reason to use any additional force. If these are the facts, then the officers used excessive force and cannot claim that there was any uncertainty as to their right to use the force employed.

B.   Liability of the City under § 1983

Plaintiff Graves also sues the City under § 1983. "[A] municipality cannot be held liable under 1983 on a respondeat superior theory." Monell v. Dep't of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018 (1978). Thus, the City is not liable under § 1983 for the negligence of its employees. See Thompson v. City of Los Angeles, 885 F.2d 1439, 1443 (9th Cir. 1989). Instead, plaintiff Graves must show that a City policy, practice, or custom caused the violation of his rights. Monell, 436 at 690; see also Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099 (1985) (finding that a city is liable if it is the "moving force" behind a civil rights violation).

Plaintiff Graves asserts two bases for holding the City liable: (1) "the officers used force in accordance with and pursuant to department policy"; and (2) the City failed "to train or supervise" the officers.[1] However, plaintiff Graves fails to

---

[1] Plaintiffs also submit a declaration from an expert witness who states that the SPD's lack of a canine policy caused Graves' injuries. (Bogardus Decl. ¶ 19.) He also asserts that the Department had a policy permitting excessive force because it failed to criticize either dog handler for his conduct. However, at the hearing plaintiffs conceded that the SPD had a canine use policy when the incidents occurred. Therefore, this argument fails. Furthermore, there is no evidence that the Department ratified the conduct of the dog handlers having found the facts to be as plaintiffs assert.

6

provide sufficient evidence to support either basis for municipal liability.

### 1. Use of Force in Accordance With Policy

Defendants have the burden of showing that plaintiff Graves has failed to produce evidence from which a reasonable jury could find that a City policy, custom, or practice caused the violation of his rights. Celotex v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). To satisfy this burden, defendants provide the SPD canine use policy and the SPD use of force policy.

The SPD canine use policy is five pages long and sets forth guidelines for the "[u]se of police canines." (Green Decl. Ex. 11.) The policy states: "Canine use should be tempered with an awareness of the public's sensitivity and occasional outright fear of dogs." (Id.) According to the policy, there are six intended uses of SPD canines: (1) "Officer personal safety"; (2) "Apprehension of fleeing suspects"; (3) "Search"; (4) "Approved crowd control"; (5) "Mutual aid requests"; and (6) "Demonstration requests." (Id.) The policy provides that a police dog can be used to assist an officer who is being assaulted; however, a dog should only be used "when it appears obvious other less aggressive measures of defense would not be effective, (i.e. negotiation, physical restraint)." (Id.)

The SPD use of force policy is eleven pages long. It states: "Department members may use reasonable force to effect an arrest, prevent an escape, or overcome resistance. The type and degree of force used will be reasonable, based upon the facts of

7

the situation. Only that force necessary and reasonable for the crime involved will be used." (Id.) The use of a police dog is considered force under the policy and is prohibited "against non-combative persons" except to conduct a search. (Id.)

In response, the only evidence plaintiff Graves provides to support his claim is the deposition testimony of Johnson and Thrush, the dog handlers involved in the two incidents. (Opp'n at 23-26.) At his deposition, Johnson stated that he believed "department rules" permitted him to release a dog on a man who was striking another officer in the chest in an effort to escape. (Johnson Dep. 46:8-25.) Officer Thrush stated that "our canine sergeant" declared that the April 10, 2002 bite was "in policy" because Graves was wanted for felony robbery, he was actively resisting arrest, and was assaulting police officers. (Thrush Dep. 72:7-11.)

There are a number of problems with plaintiff Graves' submission. First, these barebones comments do not establish what department policy was at the time of the incidents. Johnson merely states that he thinks he acted in conformity with policy. There is no showing on what he based his opinion. Thrush's testimony is equally unhelpful. He gives a second hand version of what another officer concluded based on circumstances that are not specified in any detail. Plaintiff Graves apparently failed to depose those persons in the department who are responsible for formulation of the department's policies on the use of force. On the basis of this scanty proof no reasonable juror could

8

conclude that the department had a policy that was different than its announced written policy. Second, it is not at all clear from these brief comments that the policy as described would permit an unreasonable use of force. In both depositions the officers describe situations in which an officer is under direct assault. Finally, there is no evidence of recurring instances of excessive force by dog handlers such that a jury could conclude that the department had a policy or custom other than that expressed in its written policy. See Meehan v. County of Los Angeles, 856 F.2d 102, 107 (9th Cir. 1988) (holding that evidence of illegal conduct during two police raids was not enough to show a practice or custom); Nadell v. Las Vegas Metro. Police Dep't, 268 F.3d 924, 929 (9th Cir. 2000)(holding that proof of single incident of unconstitutional activity does not show a custom or practice).

In sum, on the evidence provided, plaintiff Graves fails to show that the defendants were acting in accordance with an unconstitutional policy.

2. <u>Inadequate Training</u>

To succeed on a § 1983 claim against the City under a theory of inadequate training, plaintiff Graves must show that: (1) the City failed to provide adequate training; (2) the City exhibited deliberate indifference to adequately training the officers; and (3) the inadequate training caused the deprivation of Graves' rights. However, plaintiff Graves has provided no evidence to show that the City failed to provide adequate training or that

9

the City was deliberately indifferent to the training of its officers. In fact, after naming this theory as one of two bases for City liability, plaintiff Graves fails to discuss it at all, perhaps conceding the point. Without introducing evidence of the training programs offered by the City or the training that the individual defendants received, plaintiff Graves cannot succeed at trial on the claim that he was injured because the City failed to adequately train its officers.

Because plaintiff Graves have failed to produce evidence to allow a reasonable jury to find the City liable for his injuries, defendants' motion is GRANTED on the § 1983 claim against the City.

C.   Liability Under the California Tort Claims Act

Plaintiffs assert state law claims for negligence, intentional infliction of emotional distress, and battery against all defendants. Defendants argue that they are immune from these claims under Cal. Gov't Code §§ 820.2, 820.4, and 821.6. However, "California denies immunity to police officers who use excessive force in arresting a suspect." Robinson v. Solano County, 278 F.3d 1007, 1016 (9th Cir. 2002); see also Scruggs v. Haynes, 252 Cal.App.2d 256, 264 (1967) ("The California cases have consistently held that a peace officer making an arrest is liable to the person arrested for using unreasonable force."). Therefore, none of the immunities claimed by the individual defendants applies here. The individual defendants' motions for summary judgment based on statutory immunities are DENIED.

The California Tort Claims Act provides that public entities in California are liable for injuries caused by their employees if: (1) the employees were acting within the scope of their employment; and (2) the employee could be held personally liable for the action. Cal. Gov't Code § 815.2(a). From the facts as presented by Graves, a jury could conclude that the officers caused his injuries during the course of their employment. As discussed above, those individual defendants are not immune from suit if the force used against Graves was unreasonable. Therefore, the City, as employer of the individual defendants, can be held liable for plaintiffs' damages under § 815.2(a). The City's motion for summary judgment based on statutory immunity is DENIED.

D.  <u>Intentional Infliction of Emotional Distress</u>

Graves, Sr. and Corey assert claims for intentional infliction of emotional distress. The relevant facts for these claims, when viewed in the light most favorable to plaintiffs, are as follows. Graves, Sr. and Corey watched a dog attack Graves, their son and brother, respectively, at the direction of a police officer, while Graves was lying on the ground in a hogtie, and while they were detained in separate police cars, unable to assist him.

The elements of an intentional infliction of emotional distress ("IIED") claim in California are: (1) "[e]xtreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the potential for causing,

11

emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." KOVR-TV, Inc. v. Super. Ct., 31 Cal.App.4th 1023, 1028 (1995). Defendants argue that plaintiffs cannot prove the first two of these elements.

1.  Extreme and Outrageous Conduct

"Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." Id. (citation omitted). "Generally, conduct will be found to be actionable where the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Id. (citation and internal quotation omitted). The court finds that, when viewing the facts in the light most favorable to Graves, a jury could find that the police engaged in outrageous behavior when they directed a police dog to bite a hogtied man so viciously that part of his ear was ripped off.

In addition, the court finds that a reasonable jury could conclude that the officers exercised reckless disregard towards Graves, Sr. and Corey when they ordered the dog to attack Graves while he was hogtied and in their plain view. Because plaintiffs need not prove that defendants intended to injure Graves, Sr. and Corey, just that they "devoted little or no thought to [the] probable consequences of [their] conduct," the court finds that defendants engaged in the requisite conduct to support an IIED

claim. Id.

2. Emotional Distress

Emotional distress for which a plaintiff can recover "includes fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation and indignity, in addition to physical pain." Thing v. La Chusa, 48 Cal.3d 644, 648-49 (1989). It may include "all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea." Young v. Bank of America, 141 Cal.App.3d 108, 114 (1983). "Severe emotional distress means . . . emotional distress of such substantial quantity or enduring quality that no reasonable [person] in a civilized society should be expected to endure it." Girard v. Ball, 125 Cal.App.3d 772, 787-88 (1981) (internal citation omitted). "It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed." Fletcher v. W. Nat'l Life Ins. Co., 10 Cal.App.3d 376, 397 (1970).

Graves, Sr. avers that he gets visions of his son's mauling whenever he returns to the gas station, and that he has woken up at night "frightened and frustrated by being handcuffed in the police car and forced to watch the cops mutilate my boy with a dog and not being able to do anything about it." (Graves, Sr. Dep. ¶ 6.) Corey avers that she could not sleep for "quite a while, thinking about how the cops treated my brother. In fact,

13

I cried about it for several days." (Corey Dep. at 2.)

The California case law reveals that a reasonable jury could conclude that these facts constitute severe emotional distress. In Young, a woman sued Bank of America for IIED because the bank instituted a collection action against her for unpaid credit charges even though she had informed the bank that her credit card had been stolen. 141 Cal.App.3d at 115. She claimed that her negative credit rating and the rejection of a credit card application caused her embarrassment, shame, and feelings of helplessness and frustration. Id. "She complained of severe stress, nervousness, headaches, and insomnia." Id. The appellate court upheld the trial court's finding that the plaintiff had alleged facts from which a reasonable jury could conclude that she had suffered severe emotional distress. Id.

Similarly, in Golden v. Dungan, 20 Cal.App.3d 295, 311 (1971), the plaintiff made an IIED claim against a process server who knocked on his door at 11:00 in the evening. The plaintiff alleged that as a result of this disruption to his sleep and ensuing interaction, the "plaintiff became frightened, upset, nervous and humiliated, and suffered extreme and severe mental suffering and duress." 20 Cal.App.3d at 311. The court found that this was enough for the claim to survive summary judgment. Id.

Graves, Sr. alleges that he experienced fright, grief, shame, and disappointment as a result of witnessing the attack on his son. Corey alleges that she suffered grief and insomnia

14

caused by witnessing the incident. Although neither plaintiff alleges that these emotions were particularly "enduring," a reasonable jury could conclude that they were "substantial." As a result, the court finds that plaintiffs have alleged enough facts to meet their summary judgment burden on this issue.

Therefore, viewing the facts in the light most favorable to the plaintiffs, the court holds that plaintiffs' IIED claim does not fail as a matter of law. Defendants' motion for summary judgment on the IIED claim is DENIED.

E.   Negligent Infliction of Emotional Distress

A claim for negligent infliction of emotional distress ("NIED") requires plaintiffs to prove that they: (1) are closely related to the victim; (2) were present at the scene of the injury-producing event at the time it occurred and knew that the victim was being injured; and (3) suffered emotional distress beyond what a disinterested witness would likely suffer. Thing, 48 Cal.3d at 647.

As Graves' father and sister, Graves Sr. and Corey are closely related to Graves. Id. at 668 n.10. Furthermore, it is undisputed that they witnessed Graves' injuries firsthand. Therefore, the only issue regarding their ability to recover on their NIED claim is whether they suffered more emotional distress than a disinterested witness would likely have suffered.

The California Supreme Court has characterized such distress as "serious mental distress." Molien v. Kaiser Found. Hosps., 27 Cal.3d 916, 927-28 (1980). "Serious mental distress may be found

15

where a reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." Id. at 929-30.  "Severe mental distress" appears to be a more exacting standard than "serious mental distress." See Cal. Jury Instructions - Civil §§ 12.73, 12.80, 12.83 (2005).  Therefore, for the reasons stated above, the court holds that a reasonable jury could find that plaintiffs suffered serious mental distress.  Defendants' summary judgment motion is DENIED on the NIED claim.

F.   Plaintiffs' Request for Summary Judgment

    Plaintiffs did not file a cross-motion for summary judgment. However, in their opposition, plaintiffs request that the court find that defendants' conduct violated the Fourth Amendment as a matter of law.  (Opp'n at 27 (citing Cool Fuel, Inc. v. Connett, 685 F.2d 309, 311 (9th Cir. 1982).)  A court can grant summary judgment to the non-moving party if it finds that there is no genuine dispute of material fact and that an issue can be resolved as a matter of law.  Cool Fuel, 685 F.2d at 311.  The court declines to grant summary judgment to plaintiffs sua sponte given that the facts are in such dispute.

                              III.

    The Ninth Circuit has admonished district courts to grant summary judgment for defendants in police misconduct cases "sparingly."  Santos, 287 F.3d at 853.  "This is because police misconduct cases almost always turn on a jury's credibility determinations."  Id.  This case appears to be a typical police

16

misconduct case, with each party presenting very different versions of the facts. In light of this warning and based on the above analysis, the court GRANTS defendants' motion for summary judgment on Graves' § 1983 claim against defendant the City; DENIES defendants' summary judgment motion on all other claims; and DENIES plaintiffs' request to find a constitutional violation as a matter of law.

   IT IS SO ORDERED.

Dated: 3/24/2006


_____
DAVID F. LEVI
United States District Judge